Let's see, this is 413-0079, the Illinois Association of Realtors v. John Filan, Attorney Fahy is here on behalf of the appellant, and Attorney Lecker is here on behalf of the affilee. Mr. Fahy, are you ready to begin? Good morning. May it please the Court. Because of the number of issues and the complexity of some of the issues, I thought it would be prudent or advantageous if I initially gave you a roadmap as to the order I intend to proceed. That way you can always redirect me to something that you feel is more important than what I'm talking about. Having said that, I'll begin with introductory opening comments describing the general nature of the case. It's then my intent to address the question that this Court posed to us as it relates to the Supreme Court Rule 3 and its jurisdiction. I then intend to move into standing, because if we don't have standing, I can save my breath on the rest of the arguments. Next, I will address the writ of mandamus, because it's a fairly straightforward self-contained issue, before moving on to the substantive arguments as it pertains to the uniformity clause and the due process clause. If there are no objections, I'll proceed. This case comes before you today on appeal by the Illinois Association of Realtors. We seek to reverse the trial court's decision to grant the state's motion to dismiss, finding that the Illinois Association of Realtors failed to state a claim and that the realtors like standing. Now, the state has done an excellent job in its pleadings before this Court and the state trial court, demonstrating that it has the lawful ability to charge regulated entities a fee or individuals a fee. That it has the lawful ability to transfer and expend money from those designated or specialized accounts. And that, more importantly for the discussion before us today, that it certainly has the lawful ability to move money from designated, specialized accounts into the general revenue fund to pay general revenue debts. You're not going to hear arguments from us that they don't have the ability to do each one of those independent, lawful acts. The problem is the state then necessarily argues next that because we have the ability to do each one of those independent, lawful acts, well, no cause of action could arise if we're able to accomplish an unlawful means. In essence, that is what the appeal is about as far as the Illinois Association of Realtors is concerned. Is can they engage in lawful acts and accomplish an unlawful act? By way of example, if the state passed legislation... Wait a minute. Yes. If they're unlawful acts, or if they're lawful acts, how do you get to the conclusion that the ultimate thing is unlawful? Sure. No problem. Let me give you an example. If the state of Illinois passed legislation imposing a $500 flat tax for general revenue funds on each realtor in order for them to enjoy their profession or engage in their vocation, this court would certainly fine. I would hope it would certainly fine, but that would be a violation of the Uniform and Due Process Clause. Now, we're not saying these different statutes, the Budget and Implementation Act and or the Executive Order or some of these others are independently, facially invalid, but as applied in concert with each other, that they're accomplishing an unlawful means. In other words, they have found a way to orchestrate independent lawful acts to accomplish an unlawful end by imposing a tax on realtors that they could not otherwise do. Again, that's the issue that we're presenting to the court. Okay, I'm having a hard time wrapping my brain around that. You're saying you can do three lawful things, but when you put the three things together, it can accomplish something unlawful. Correct. That's what your argument is? Correct. And that each one of the acts, when done together, it's like a crime with your experience. You can do certain acts individually, and they don't constitute a crime until you put them together. Then it's a crime. For example, okay, now I'm going out of my comfort zone, but it would be like attempted murder when there's no bullets in the gun. Well, until you put the bullet in the gun, then you're not really reaching attempted murder. Excellent. Now, making that argument, sure, it can be attempted murder without there actually being a bullet in the gun, but that's essentially my example. But before I get to my – go ahead, because you're still looking at me puzzled. I'm not sure you're – I'm not sure you're – Well, like I said, I'm not a criminal lawyer, so I know you were. I'll let you develop your argument, but I'm having a hard time, just so you know, as you're making it, accepting the proposition that three lawful acts when put together can somehow end up in an unlawful action. Okay, flip it around. Because they're put – because they're commingled together. That, to me, is a difficult concept. That's fine, and a better way for you to maybe approach it is the way we're approaching it, and that is if you believe the state could actually impose a flat tax on realtors of $500 a piece, and it doesn't violate the uniformity clause or the due process clause, well, then it's really not an issue for you. Your decision is already made. But if you think they can't do that, why would it be possible for them to engage in what would be independent lawful acts unless done together in order to accomplish the same goal? That's the issue. Does that help at all? Yeah, I'm following. Okay. Well, at least – I needed you to at least buy that initial concept, because if not, then I'll talk to these things. I'm very open-minded to hearing more, okay? Okay. I mean, in short, that's really the gist of the issue we're presenting to the court. But let me go ahead and address those other issues so that we can kind of get the housekeeping issues out of the way. Illinois Supreme Court Rule 303A2 says that if there is a timely post-judgment motion filed, that any prior filed notice of appeal is essentially told, and it's told into the disposition of that timely post-judgment motion. The post-judgment motions that actually have that tolling effect, according to the Fourth District, would be those motions articulated in Section 2-1203, which are motions that direct you against the judgment and would include such things such as a rehearing or retrial, motion for consideration, modification in order to vacate the judgment. Now, the Supreme Court has held in Steinbrecher v. Steinbrecher, and for your law clerks, the site is 197 L. 2nd 514, pinpoint site 527. It's a 2001 Supreme Court case. I quote, a state of judgment is collateral to the judgment and does not affect or alter the issues on appeal. In other words, it is, in fact, a final judgment in the trial court. It is, in fact, no effect or directed against. The motion stays not directed against that judgment whatsoever. To make my point more poignant, had the trial court actually taken some action and denied it, under Rule 305, I could come in here and ask you again for a motion to stay. But just to kind of clarify the matter and clear the decks, yesterday we filed a motion to voluntarily vacate our motion to stay. We got an order securing that, and we filed a motion to supplement the record with you to include those, just so that there isn't any pending then motion as the motion to stay with the trial court. Even if we didn't do that, it's kind of a belts and suspenders approach on our part. You have jurisdiction here. Let's go on to standing. This case is somewhat interesting in that we actually argued standing under four different grounds. We argued individual standing for IAR. We argued statutory standing under the Illinois Not-For-Profit Act. We argued common law standing as a representative entity. And then we also argued taxpayer standing. The trial court found it doesn't really matter what we argued in his perspective. We had no standing whatsoever. So let's talk about individual standing. Because if we can establish individual standing, at least as it relates to IAR, then we can go ahead and assume that standing would exist as it relates to our statutory standing and our common law standing. Individual standing. In order to have individual standing, you have to suffer an injury that is legally recognized interest, that is distinct and palpable, number one. Number two, fairly traceable to the defendant's actions. And number three, substantially likely to be remedied or addressed if you get the relief requested. Let's talk about what are distinct and palpable injuries. We said there's at least four. I think we identified six in our case. Number one, we argued we're being taxed twice. Okay? And the reason why we argued we're being taxed twice is it costs X amount to regulate the profession. The state is charging this much more than it costs to regulate the profession. And the reason why they're charging that much more is so that they can pay down general revenue debt. Number one is we're saying we're being taxed twice. Number two, we are paying excessive regulatory fees for the privilege to enjoy our vocation. Number three, that we've been, and I'll articulate this more fully in the Uniformity Clause argument, that we're being arbitrarily classified. And number four, even though we're paying excessive regulatory fees, we're not even getting what we're statutorily entitled to be provided under the license act. And that's the argument where it goes to, for every 1,000 persons who are regulated, you're supposed to have an investigator. I'm sorry, for every 10,000, you're supposed to have an investigator. And for every 20,000, you're supposed to have a prosecutor. So those are what we're arguing are distinctive palpable injuries. We're literally paying money out of our pocket, above and beyond what it costs for regulation, in order to pay down general revenue debt. And we're still not getting back what we're statutorily entitled to in response or for the benefit of the bargain. Now, is it fairly traceable to the defendant's actions? I don't see how it couldn't be. It's certainly the state that's undertaking all of these acts. It's not somebody else. And then last but not least, if we are granted the injunctive relief, if we're granted the relief we're requested, it would be remedied. And the type of relief we would request is either, look, charges what it actually costs to regulate us. We're not saying you can't take all the money in our account right now, and there was $24 million in this appeal that was filed in 2012, and go ahead and put that into general revenue. We're not saying you can't do that, because you can do that. Obey and address that. What we're saying is what you can't do is keep charging us in well in excess in order to continually, annually, every year, pay down general revenue taxes. That's what our argument is. Now, if you buy that we have individual standing, then we would have statutory standing and common law standing, because the claim being heard doesn't require the individual participants, and we would adequately represent all those IAR members. And last but not least, let's talk about taxpayer standing. You have taxpayer standing if you're liable to replenish public revenues by allegedly unlawful act. Now, the state will argue, first of all, that we're not obligated to replenish those monies, but that, more importantly, what they're doing is not allegedly unlawful. Again, we argue it's unlawful because it violates the Uniformity Act and Due Process Clause because they're taxing us twice. But more importantly, we are certainly obligated to replenish those. Now, the state will argue that, look, it is set by statute how much you have to pay. It doesn't matter how much money is in the fund. Well, here's why that argument is point-blank false and speculative at best. In our motion to stay, and at least two of you live in the neighborhood, so you read the paper, you see it on the news as a lead story. In 2012, what happened to the doctors and medical disciplinary fund? They had to lay off 18 people because there is no money in the medical discipline fund, screaming about how they don't have anyone to regulate the profession. Well, they also said, what do they have to do? We're going to have to double the regulatory fees for the doctors to put money into the fund so that we can adequately regulate these doctors. Well, why was the fund vacant? Because they took $9 million out of it. They swept $9 million out. So this speculative argument that somehow we're not responsible for replenishing the fund, sure we are. And in fact, in 2004, although there was sufficient money in the fund to continue regulating the profession, again, based on the allegations and the complaint, they bumped up the regulatory fee by, in some cases, 100 percent because it was going to take effect at the same time the Budget Implementation Act of 2007 went into effect. So then they would have excess money in the real estate licensing fund so they could take it and start paying down general revenue debt. Now, don't get confused about, you know, I understand where I'm coming from and that this is a difficult uphill argument and that this would be an outlier, but there are outlier cases that specifically address it, where, you know, they charged an additional fee for marriage licenses to pay for domestic violence programs, where they charge additional fees to try and think about the other case files. But those are somewhat outliers and then the Supreme Court has retreated from them. Well, I think this is one of those cases that justifies it because if you don't step in and say you can charge whatever you want as a regulatory fee, there is no check and balance. This goes off the reservation. They can do whatever they want. And they can charge a regulatory fee that so far exceeds reality to pay down general revenue, but they have a whole tax system set up and ready to go that no one can put in check. Which brings us, just because I probably need to address this voluntary payment doctrine, because they say, well, even if you are, even if this is a tax, and don't be confused. They're arguing this is not a tax. This is nothing but a regulatory fee. But they say, even if it was a tax, you voluntarily paid it. Well, the voluntary payment doctrine wouldn't apply in this case for three reasons. Number one, we'll acknowledge the protest when the taxes were being paid. We didn't know we were paying the tax. We figured out we were paying the tax after the fact. Number two, we paid the taxes and are implied to rest. If you don't pay your regulatory fee, you don't get to enjoy your vocation. You're plain blank out of work. So either pay these fees or you don't work. And last but not least, we did pay them under protest. And the reason why we paid them under protest is that the trial court entered a preliminary injunction in 2006 saying that, look, you can no longer take money out of this unless you consult with opposing counsel or come to the court to make sure that the type of money you're expending is actually authorized under some of these existing statutes. Because you've got to remember, in addition to sweeping money out to pay general revenue debts, they're taking a boatload of money, which is identified in our briefs, to pay for any conceivable cost you can remotely consider associated with the regulation of a profession or the operation of government. When did the fee increase go into effect? 2004 is when the legislation was passed, and it went into effect, I think, 2006, right before the 2007 budget implementation went into effect. How much does it cost to do what they're supposed to do? Well, that's, thank you. We suspect it costs $2 million a year. Part of their argument is that we expect it to because we don't know how much it costs, and so therefore we shouldn't be able to proceed any further. Without being able to have standing to actually proceed on this, we can never establish that. But by way of example, there's $24 million sitting in there as of 2012, which would mean that's extra money. That's not the annual basis. That's extra money they were going to take out in 2012, and they were going to take out $24 million to pay the Illinois Department of Aging's line item for senior medicine. They weren't even pretending anymore to direct it to the general revenue fund. They were just taking it straight out and putting it right into the Illinois Department of Revenue to pay for medicine. That's money above and beyond what it presumably would cost to regulate, because hopefully they wouldn't make the same mistake twice where they took out all and then wouldn't have enough to sufficient money to regulate the profession. What was the fee in 2004? I'm guessing about $100. I'm not sure. How much is it now? It would be, whatever it was then, I think it was double. I apologize, I shouldn't know that fact. But it ended up doubling. And when I come up here on rebuttal, I'll be more than happy to tell you exactly what it was. What does the Abate case do to you? What Abate established is that, look, there are no special designated accounts that we can't get to. The theory in Abate was that it was a traffic safety or something. Motorcycle safety. Motorcycle safety. And it had all these buzzwords that would make it like a trust fund, that you couldn't take money from it. And what the Supreme Court said there, and what the Fourth District said there, and the trial court, which was Judge Zappa, the exact same guy, he said, look, it's public money once it goes into the till. And we're not fighting that one. We're not arguing Abate. We agree it's public money. But we're saying that you can't charge us well beyond what it costs to regulate the profession. So you can get more tax cuts from us. It's a scam. And if we don't have standing challenges or the ability to challenge us, then we're really out of luck. Because no one can. They can do whatever they want. The only people who can hold them in check are the courts. Let me go ahead. Because I knew this was going to be an issue. Let me go ahead to the rearman, Davis, and I think I can follow up on rebuttal if it's okay with you as it pertains to the uniformity clause. But the bottom line is, if I can't make the uniformity clause work, the due process clause is dead in the water. The uniformity clause gives us more rights than the due process clause. So I'll focus my attention on that. Let's talk about the rearman, Davis. The statute says, end quote, the department shall employ a minimum of one investigator per 10,000 licensees and one prosecutor per 20,000 licensees in order to have sufficient staff to perform the department's obligations under the act. Shall and obligations. The language of the act expressly identifies what the department must do, given a specific set of facts, and in obedience with a mandate of a legal authority, and without reference to the department's discretion. You'll hear many arguments, and you'll read it in the pleadings again and again, that somehow we're trying to impair or the legislator is impairing the discretion of the department. It's not. They can hire whoever they want. They can hire based on whatever skill set they have. That sets a mandatory minimum basement as to what you're supposed to have to adequately regulate the profession. It's not telling them how they have to do it or anything. It's literally telling them when these facts occur, you must do this. And what's really upsetting about this is we're paying more than enough money for them to do that, but they're refusing to do it. And why are they refusing to do it? Because we're using that money to pay off general revenue debt. Now, they could argue that. Thank you, Mr. Fahy. We'll hear from you on rebuttal. Mr. Legner? Mr. Legner, this is like a cash cow for the state, isn't it? I wouldn't necessarily imprint Legner on behalf of the defense. I wouldn't necessarily call it a cash cow. I didn't think you would. Okay. I presume you wouldn't call it a scam either. I certainly would not. And I guess in answer to these specific questions or comments, the law is clear that when money is collected and goes to the state, the state can then transfer those public funds to pay for other things when it decides it needs to. Abate makes that very clear, and Abate relied on other cases, such as this court's Ballstatt case. There's a long line of cases. Some cited within those cases go back to the 1950s. They clearly established that proposition. Here, there's no challenge to the administrative regulation that set forth the real estate license fee. They challenge the 2007 Public Budget Implementation Act that swept certain amounts from that fee into general revenue or otherwise required it to go other places. But, again, the law is clear that the state can do that. That doesn't show that the fee, which they haven't challenged, the regular regulation that sets forth the specific fee, is improper in any way. I will turn then to the issues in order of how they were addressed by the appellant, starting with the question that the court sent to the parties concerning the jurisdiction with the pending motion to state. Now, it is true, I think, that the question is essentially moved, given that plaintiffs have apparently withdrawn their motion to state. But even if they hadn't, the presence of a motion to state, the enforcement of a judgment, has no effect on the finality of that judgment. The circuit court certainly retains indefinite jurisdiction to enforce its judgments, and staying that judgment is part and parcel of that authority. The judgment remains final all along. The court can't change its judgment after there's been an appeal and the time to file a post-judgment motion attacking that judgment has run. But it can certainly enforce it or state the enforcement of it. The second point is the standing issue, Your Honor. Plaintiff tries to explain that they have a specific injury because they are taxed twice, because they are subject to excessive regulatory fees, etc. But that's not a result of the 2007 Budget Implementation Act. The 2007 Budget Implementation Act simply took fees that were sitting in the real estate license administration fund and put it elsewhere to the extent that the General Assembly decided to require it. That did not affect the amount of fees that plaintiffs were paying. It did not affect any specific interest that the plaintiffs had. The plaintiffs have no proprietary interest in the fees in that fund. That fund is public money, and the General Assembly, under abate and other authority, are free to move it around. So plaintiffs cannot state any specific individualized injury to any interest they have sufficient to maintain any sort of standing in this case. Now, they also argue that they are obligated to replenish the fund,  the fee is imposed, the real estate license fee is imposed on the plaintiffs' members, regardless of how much money is in the fund. So it's not a question of replenishing, it's irrespective of how much is in the fund. They need to pay the fee, period. Additionally, the 2007 Budget Implementation Act specifically provided it, and this was at Section 845B of the State Finance Act, which was amended by the Budget Implementation Act, specifically provides that when any of the funds listed in subsection A, the real estate license administration fund, has insufficient cash from which the state controller may make expenditures, properly supported by appropriations from the fund, then the state treasurer and the state controller shall transfer money from the general revenue fund into that fund to make its expenses. And that's from the statute, and it's cited in the statute of all section in defendant's brief at page 3, going on to 4 is what I'm quoting from. So in other words, if the fund is swept away and goes to zero, such that the comptroller can't make required payments out of it, well, then the statute requires the comptroller and the treasurer to pull money from general revenue into the fund to make the required payments. So it's not a question that the fund is going to zero, and then we have to do an extra fee onto plaintiffs to replenish it. The plaintiffs pay their fee no matter what, and then the comptroller and the treasurer, if needed, will pull money from general revenue if the sweep was too broad. Turning to the mandamus issue. Section 2520 of the Real Estate License Act provides that the state shall hire one investigator for 10,000 licensees and one prosecutor for 20,000 licensees. But this statute does not give plaintiffs any clear enforceable right under mandamus. The statute does not provide anything that any individual can enforce against the state. It's a statute that provides guidance to the state as to what its hiring parameters should be, what its personnel requirements should be. This is consistent with this Court's decision in some of the cases coming out of the Department of Corrections litigations that say, you know, look, the Code of Corrections that says, for instance, commissaries can only charge X amount for various items. It provides guidance to the Department of Corrections. It does not run any individual, an individualized enforceable right that they can enforce through mandamus. Moreover, Section 2520 guidance regarding the number of investigators and number of prosecutors is a directory, is a directory as opposed to mandatory proposition. Under the People v. Robinson case, which governs, which sets the standards governing whether it's a directory, the statute does not specify the consequences of the failure to comply with this hiring statute. It does not contain any negative language, nor does, nor is it necessarily, nor is this, sorry, is this complaint with this necessary to protect individual rights. Therefore, that provision is both a directory and otherwise just a guidance provision that gives personnel enforceable rights. Concerning, turning to the Uniformity Clause challenge. The Uniformity Clause governs revenue laws that create classifications and provides that, provides that a revenue law that creates a tax or fee classification. And it doesn't matter whether you call the real estate license fee a fee or a tax. The Uniformity Purpose, it doesn't matter. It's the same thing. This analysis is exactly the same. It provides that such tax or fee classifications, revenue classifications, must be reasonable. It must be, they must be reasonable. But the Budget Implementation Act isn't a revenue, isn't a revenue statute. It doesn't create any tax or fee classifications. All it does, all the 2007 BIMP, Budget Implementation Act does, is move funds, public money from one fund to another in order to try to effectuate a workable state budget. Because that statute is not a revenue law that creates classifications, tax or fee classifications, the Uniformity Clause simply is inapplicable. And again, the abate decision provides that once the funds have been paid, once public funds have been paid, as long as they are used for public purposes, there's no problem, no constitutional problem, no problem with the government moving the money from one fund to another fund or to general revenue, as the case may be. Furthermore, even if there were a tax or fee statute at issue, the fact of a fund sweep does not render the Budget Implementation Act unconstitutional. To be reasonable, there must be some benefit to the payor. And the payors, the realtors, can't claim that they receive no benefit from either the fee that they do pay in terms of the direct benefits from the licensing statute and the Department of Professional Regulations Bureau of Real Estate at direct regulation of the industry, of educational requirements, administration of the fee scheme, etc. But additionally, there need not be only one beneficiary. And this, again, is from the Falstead case. So what does that mean? That means that the fee does not have to be a one-to-one, you pay this much because this is how much it costs us to directly benefit you. In fact, in Falstead, they needed $6.5 million to effectually direct the NPDES program, the Pollution Discharge Program, but collected over $24 million. So there's approximately a four-to-one ratio of amount collected to the amount actually directly needed. And this court found that there was no constitutional problem with that because there can be other beneficiaries of the money collected. There does not have to be only a direct benefit. Plus, there are indirect benefits, such as enabling the state to continue to be a going concern, enabling the state to be able to pay its budget. Moreover, the realtors gain indirect benefits from the operation of many different state programs and state agencies. For instance, and some of them are laid out in the Appellee's Briefs, but for instance, the other state agencies that enforce violations of the Act or the other state agencies that do professional regulation activities. So then, under Falstead, this Budget Implementation Act, even if it created some type of tax or fee classification, would not be unconstitutional because there is some benefit that certainly goes to the real estate licensees. They may not be the only beneficiaries of the amount that they pay. They indirectly benefit from the other activities that are paid for by the excess money. Then, turning finally to the due process argument, under Falstead, the substantive due process claim is subsumed by the uniformity analysis. So essentially, finding that there is no uniformity problem means that there is no due process problem. But if the court were to look beyond that, under the Supreme Court's POTS decision, we would analyze this under a rational basis analysis. The plaintiff certainly tries to cast this as this infringes our right to engage in our chosen profession, so it should be subject to scrutiny. But the Supreme Court specifically in POTS rejected that and applied a rational basis analysis to statutes that can have an effect on professional regulation statutes. But the 2007 Budget Implementation Act does not affect the right to practice their profession. The 2007 Budget Implementation Act does not charge a fee. It does not increase the fee. It's irrelevant to the fees they pay that was otherwise established by the administrative regulation. And regardless of whether the fund was swept or not, they would still be paying that fee. That is otherwise not challenged. The regulation in that fee is otherwise not challenged in this litigation. Moreover, the 2007 Budget Implementation Act is rationally related to conducting state government, and the fee sweep is reasonably related because the plaintiff's members and the plaintiff's organization receives indirect benefits from, again, the ongoing conduct of state government. The same rationale as this Court explained in Halstead in upholding the statute there. If this Court has no further questions... It doesn't look like we do. Thank you very much. Any rebuttal, Mr. Fay? Justice, first of all, the exact amount I don't know. I just know that the renewal in 2004 was increased 100 percent. So far, it's been licensed to be 100 percent. As it pertains to the BIMP, the Budget Implementation Act, we agree that it wasn't a particular act that increased revenue. Before the BIMP in 2007, the money was stuck over here in the real estate licensing fund. They had the ability to go ahead and expend money from designated funds. Once the BIMP was put in place, there's nothing we could have done before the Budget Implementation Act because that was, in fact, the effectuating agent that allowed them to move the excess fees from the Real Estate Licensing Act into the General Revenue Fund. Up until that point in time, we really had nothing to complain about because even though the fees were excessive, it was still going to what they were charged for. We wouldn't have had standing in that case. So once the BIMP went into effect in association with Executive Order, I think it was 2003-10, those were used in their entirety in concert in order to effectuate the plan of getting extra revenue from realtors unrelated to the regulation of profession so that we could pay general revenue debt. I mean, it was a concerted, well-planned, purposefully done legislation. How do we get money from there to there? When the original Budget Implementation Act were passed, I think 2004-2007, I mean, if you look at the prefatory language in there, it was, look, we've got an emergency. There's money in all these funds. It was sold as a one-time deal. Let's go ahead and try and get out of this debt problem. But that's not what it is. What it's turned into is literally a full-blown annual tax above and beyond the cost of regulation. That's what we're complaining about. What about Mr. Wedner's argument that you'd be paying this fee regardless? We would be paying a fee regardless. We're not complaining about the fee we're paying which covers the regulation. That's never what we're complaining about. What we're complaining about is this additional money we're paying that has nothing to do with the regulation. Again, there is a statute, and this is kind of what kills me. They have the benefit of citing all these statutes. Well, of course. Look what happens. There is a statute that actually says that if one of these designated funds gets zeroed out, that the comptroller is supposed to step in and put money into the account so that they can run their, keep doing their regulatory functions. Does that happen with the doctors? No. So they doubled their licensing fees because it was necessary. They replenished the fund. It's nice that all these statutes exist, but if they don't apply them because it interferes with their plan to get additional revenue, yeah, who cares? I understand the House always wins, but we're not in Vegas, and I'd like to actually get some type of brain on the state to keep them from doing this. What if they didn't sweep? The money just kept building. Well, thank you. If they didn't sweep and the money kept building, then we could probably file a complaint saying, look, we're paying in excess of our fees. Why don't you reduce it, or why don't you quit collecting it and quit building up the bank? And they say no. Well, then you're right. I think we may be out of luck. I mean, the money is still there. Now you understand the catch-22 we're in. If we pay in excess of regulatory fees and it stays in the fund, I think we'd have an uphill battle telling them you can't keep doing that because we're obligated to pay fees. We get the bask in the glow of good government because we receive this indirect benefit. But now that they purposely know that they can collect the extra fees to pay off the general revenue debt, and, again, we get the bask in the glow of secondary benefits, how is that in any way just or constitutionally firm when they're doing it knowing that it's nothing but a tax? It's an additional revenue generator for them, with the vehicle in place to pay off general revenue debt and obligations. What's the increase been since 2007? It was just 100% in 2007. No, you said 100% in 2004. I'm sorry. There hasn't been any since 2007. So you don't have to pay more. We don't have to pay more because it's just piling up. But part of the allegations, I thought part of the allegations were it caused the fee to increase. It did cause the fee to increase. The original, what originally happened was the 2007 VIMP went into effect, and right before that, they instituted the statute that increased it 100% in order to renew your license. That's why it increased. That happened in 2004, and the VIMP is 2007. Correct. And the reason why I told you we couldn't do anything then is because prior to the VIMP, the money just stayed in the account. And as we've already talked about here, there's really nothing we could have done about it. So they increased it. Good. It's more money. Actually, maybe they'll hire those. Those people they're supposed to hire in the statute. But they didn't. So they just pile it up and then wait for the opportunity for this litigation to end so they can take all the money and pay general revenue debt. All right. Mr. Fahey, you're out of time. I'm way out of time. We'll take this matter under advisement. Thank you for indulging. And we'll stand in recess.